## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JANINE RUDIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  03-3079 |
| | ) | |
| LINCOLN LAND COMMUNITY | ) | |
| COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendant Lincoln Land Community College's Motion For Summary Judgment (d/e 17) (Defendant's Motion).  Plaintiff Janine Rudin (Rudin) was employed by Lincoln Land Community College (LLCC) as an adjunct instructor in the Department of Business and Public Services (Department).  She applied but was not selected for a full-time, tenure-track Business Administration faculty position in the Department.  Rudin is a Caucasian female.  She claims that LLCC discriminated against her based on her race (Count I), in violation of 42 U.S.C. § 2000e-2, and her gender (Count II), in violation of 42 U.S.C.

1

§§ 2000e-2, e-3, because LLCC chose a less-qualified African-American male candidate for the position. LLCC now moves the Court for summary judgment. For the reasons set forth below, LLCC's Motion for Summary Judgment is ALLOWED.

STATEMENT OF FACTS

In Spring 2002, the Department began soliciting applicants to replace full-time faculty instructor Bob Redick (Redick) who was retiring.[1] A successful applicant would be one who could teach the same classes Redick taught, including "Intro to business, sales, marketing, management, supervision, human relations, [and] occasionally small business administration." Summary Judgment Exhibits Offered by Janine Rudin, Volume I (d/e 21) (Plaintiff's Exhibits, Vol. I), Exh. 1, Deposition of Richard Bowen (Bowen Dep. Tr.), pg. 21.

At all times relevant to the proceedings, LLCC had in place written screening and interviewing procedures. Defendant's Memorandum, Exh. A, Screening and Interviewing Committee Processes and Guidelines (Screening

---

[1]Defendant's materials inconsistently spell Professor Redick's name, alternating between "Redick" and "Reddick". Compare Defendant's Memorandum in Support of Motion for Summary Judgment (d/e 18) (Defendant's Memorandum), pg. 8, with id., Exh. G, April 22, 2002, Tepatti Memorandum to Dr. Howard (April 22nd Tepatti Memo). For the purposes of this Order, the Court will refer to him as Redick.

Guidelines); Exh. H, <u>Deposition of Nicole Ralph</u> (Ralph Dep. Tr.), pg. 30. According to the Screening Guidelines, long-time Department Chair Richard Bowen (Bowen), an African-American male, was designated as the selection committee Chairperson. A screening and interviewing committee composed of LLCC employees was assigned to assist Bowen in reviewing applications, conducting interviews, and providing feedback on the applicants. Its members included: Bowen, Redick, Arthur Meyer, Glenn Morgan, and Virgil Rhodes, all of the Department; John Scarbrough, Professor of Sociology, Social Sciences and Modern Language; Joan Lewis, Chair, Nursing Department; Holly Gietl, Academic Advisor; Maureen Harrop, Assistant Vice President, Business and Fiscal Operations; and Teri McDonough, Department Assistant, Computer and Office Information Systems (jointly, the Screening Committee). <u>Id.</u>, Exh. B, <u>Affidavit of Nicole Ralph</u> (Ralph Aff.), ¶ 3.p. According to the Screening Guidelines, the Screening Committee's role was advisory. Bowen, the Committee Chairperson, retained the power to make the recommendation up the chain of command as to whom the LLCC Board of Trustees (Trustees) should hire. <u>Id.</u>, Exh. A, <u>Screening Guidelines</u>, ¶ 13.

In addition to Bowen and the Screening Committee, Nicole Ralph

(Ralph), Director of Employment and Benefit Services in the Human Resources Department, and Equal Employment Compliance Officer for LLCC, played a roll in the recruitment. Ralph's job included coordinating with Bowen to design the job advertisement, educating the Screening Committee on the selection process, collecting resumes as they were submitted, and reviewing both the initial applicant pool and the interview pool to certify that both pools were sufficiently diverse along ethnic and gender lines. Plaintiff's Exhibits, Vol. I, Exh. 5, Ralph Dep. Tr., pgs. 21-35.[2]

Over 100 applications were submitted for the Department faculty position. Defendant's Memorandum, Exh. E, April 8, 2002, Rich Bowen Memorandum to Eileen Tepatti (April 8th Bowen Memo). The applicants were screened down to a pool of 18 candidates, from which a small group was selected for interviews.[3] Id. This interview list was then forwarded to Ralph for a diversity review. Ralph determined that Paul Hudson (Hudson), an African-American male who was not on the original interview list, was a comparable candidate in her opinion to those individuals already

---

[2]Ralph testified that she has never failed to certify an applicant pool for lack of diversity. Plaintiff's Exhibits, Vol. I, Exh. 5, Ralph Dep. Tr., pg. 35.

[3]From the record, it remains unclear who was responsible for trimming the number of applicants from over 100 to 18. Plaintiff's Exhibits, Vol. I, Exh. 1, Bowen Dep. Tr., pgs. 24-25.

on the interview list.  Plaintiff's Exhibits, Vol. I, Exh. 5, Ralph Dep. Tr., pgs. 68, 76.  Ralph contacted Bowen to discuss adding Hudson as an interview candidate.  Id. at 79-80, 85.

Ralph testified that although she could recommend to Bowen that he add a candidate to increase the interview pool's diversity, the process of determining whether to do so was a collaborative one between herself and Bowen.  Id. at 83.  Further, she explained that her recommendation as to diversity was not geared to reach a specific number of minority candidates in the interview pool.  Id. at 43-44.  It is undisputed, however, that had Hudson been Caucasian, Ralph would not have recommended that he be added to the interview pool.  Id. at 81.

After speaking with Ralph, Bowen agreed that Hudson should be added to the interview list.[4]  Id. at 79-80, 85.  After Hudson was added, Ralph certified the interview pool.  Id. at 85.  The final interview pool included: Jose Aleman, Cheryl Beery, Glen Chapuis, Theresa Gregoire, Paul Hudson, James Jump, and Janine Rudin.  Defendants' Memorandum, Exh.

---

[4]It seems likely that Darryl Morrison, Minority Affairs Compliance Officer for LLCC, was also involved in the discussion to add Hudson to the interview list, although Ralph has no specific recollection of speaking with Morrison about Hudson.  Id., pgs. 78-79.

G, <u>April 22nd Tepatti Memo</u>.

According to her resume, Rudin received both her Bachelor of Arts in Management (1990) and Masters of Public Administration (1993) from Sangamon State University. At the time of her application she had been employed with the Illinois Department of Public Aid as a Child Support Office Coordinator since 2001. Previous employment included work as HR/Training Consultant with the Illinois Credit Union System (2000-2001), Education Coordinator for Springfield Clinic (1997-2000), Consultant for LLCC (1996-1997), K-12 Substitute Teacher for District 186 (1995-1997), Human Resource Manager/Marketing Manger, McGraw Enterprises–McDonald's (1994-1995), and both Account Technician I and II positions with City, Water, Light and Power (1989-1994).[5] <u>Plaintiff's Exhibits, Vol. II</u>, Exh. 26, <u>Resume of Janine Rudin</u>. Further, Rudin was then employed by LLCC as an adjunct faculty member during the 2002 selection process and had been teaching continuously at LLCC since 1993.

---

[5]The Court notes that there is some dispute over whether Rudin began working for City, Water, Light and Power in 1989 or 1987. <u>See</u> <u>Plaintiff's Exhibits, Vol. I</u>, Exh. 7, <u>Rudin Dep. Tr.</u>, pgs. 87-88. Rudin acknowledged that she submitted the resume currently before the Court. <u>Id.</u>, pgs. 69-70. She makes no showing, however, that she attempted to inform LLCC of the mistake before the Trustees hired Hudson. Accordingly, the Court calculates Rudin's work experience according to the statements on her resume.

Courses taught by Rudin included Management, Introduction to Business, Human Relations, Principles of Marketing, Small Business Management, Advertising, and Effective Selling. In all, Rudin's work experience and educational history, as documented by her resume, spanned approximately 13 years.[6]

According to his resume, Hudson received his Bachelor of Business Administration from Western Michigan University (1974), a Master of Arts in Management from Nazareth College (1991), and a Master of Arts from Western Michigan University (1992). <u>Defendant's Memorandum</u>, Exh. C, <u>Resume of Paul Hudson</u>. Transcripts from Western Michigan University showed that Hudson received credit for additional graduate course work after completing his 1992 Masters in Arts degree, including:

- Res Des/Data Anal. I, Winter, 1993
- Res Des/Data Anal. II, Spring, 1993
- Theories of Leadership, Summer, 1993
- Prof Field Exper, Fall, 1993
- Dissertations Seminar, Fall, 1994

<u>Id.</u>, Exh. 28, <u>Transcripts of Paul Hudson</u>. Further, Hudson received incomplete grades but one unit of credit per period for "Doctoral

---

[6]Rudin notes that she did not include her work experience before 1989, because she did not feel it was necessary for her application. <u>Plaintiff's Exhibits, Vol. I</u>, Exh. 7, <u>Rudin Dep. Tr.</u>, pgs. 88-89.

Dissertatn", in continuous academic periods from Fall 1995 through Spring 1997. Id.

At the time of his application, Hudson worked as a Sales Consultant for Springfield Lincoln Mercury Mazda. Previous employment included work as a Business Readiness Consultant for Emagination Inc. (1998-1999); Housing Director for Grand Rapids Urban League (1997-1998); Wardrobe Consultant for The Men's Warehouse (1996-1997); Senior Marketing Manager for International Profit Associates (1996); Sales Training Director for World Class Sales Training (1994-1996); Senior Account Executive for Ameritech, Inc. (1986-1994); Customer Service Manager for Colonial Engineering, Inc. (1984-1986); Telemarketing Manager for American Health & Fitness Center (1983-1984); Marketing Representative for Pitney Bowes Corporation (1981-1984); Executive Director for H&H Associates, Berrien County Employment and Training Program (1980-1981); and the positions of Accountant, Personal Property Assessor, Small Business Specialist, and Neighborhood Aide for the City of Kalamazoo, Michigan (1975-1980). Defendant's Memorandum, Exh. C, Resume of Paul Hudson. Further, like Rudin, Hudson was currently employed as an adjunct faculty member with LLCC. Id., Exh. B, Ralph Aff., pg. 3. In addition to teaching

Principles of Marketing at LLCC (1999) and Bus. 231-50 (Spring 2001),

Hudson taught the following courses at other educational institutions:[7]

- Upward Bound Program, Concepts of Business Administration, Western Michigan University (1980)
- Human Relations Management, Kalamazoo Valley Community College (1982)
- Principals of Management, Kellogg Community College (1994)
- Purchasing and Materials Management, Davenport College (1996)
- AACE, Davenport College (1997)[8]
- Business Correspondence & Communications, Lake Michigan College (1997)

Id., Exh. C, Resume of Paul Hudson.  In all, Hudson's work experience and

educational history as documented by his resume spanned 27 years.

Due to the fact that both Rudin and Hudson were adjunct faculty at

LLCC, student evaluations were also part of the materials considered by

Bowen.  Both Rudin and Hudson had excellent student evaluations.

Rudin's student evaluations for classes taught from Spring 2001, Spring

2000, Fall 1999, Spring 1999, Spring 1998, Fall 1997, Spring 1997, Fall

1996, Spring 1996, Fall 1995, Fall 1994, Spring 1994, and Fall 1993 were

---

[7]Although it is not listed on Hudson's resume, LLCC submitted a "Summary Form of Student Evaluations of Instruction" for course Bus. 231-50, taught by Hudson at LLCC in Spring 2001.  Id., Exh. C, Lincoln Land Community College Summary Form of Student Evaluations of Instruction.

[8]The parties do not explain what the acronym, "AACE", stands for.

all positive.  <u>Plaintiff's Exhibits, Vol. II</u>, Exh. 23.  Hudson's sole evaluation was for his Spring 2001 course, and he also received positive evaluations. <u>Defendant's Memorandum</u>, Exh. C, <u>Lincoln Land Community College Summary Form of Student Evaluations of Instruction</u>.  No student evaluations from the other educational institutions where Hudson taught were submitted as evidence.

Not all members of the Screening Committee participated in every interview.  <u>Id.</u>, pg. 2.  Further, the parties dispute the extent to which the members of the Screening Committee communicated their evaluations of the candidates' strengths and weaknesses to Bowen before he made his hiring recommendation.  Bowen claims he held a scheduled meeting to receive Committee feedback before he made his hiring recommendation but only one Committee member besides himself attended, resulting in a "blown meeting."  <u>Defendant's Memorandum</u>, Exh. E, <u>Bowen Dep. Tr.</u>, pgs. 50-51. Bowen's assistant, Pat Falconburg, testified that such a meeting was held and, to the best of her recollection, it was sparsely attended.  <u>Plaintiff's Exhibits, Vol. I</u>, Exh. 2, <u>Falconburg Dep. Tr.</u>, pgs. 22-23.  In contrast, Screening Committee member Arthur Meyer (Meyer) only remembers a final meeting in which Bowen announced his recommendation that LLCC

hire Hudson.  Id., Exh. 9, <u>Deposition of Arthur Meyer</u> (Meyer Dep. Tr.), pg. 37.  Meyer remembers that this meeting was attended by the full Committee, as well as by Eileen Tepatti.  Id.

It is undisputed, however, that Bowen only received written feedback from one member of the Screening Committee before he made his hiring recommendation.  Art Meyer submitted a written memo to Bowen on or about March 20, 2002, outlining his impressions of the applicants' strengths and weaknesses.  <u>Plaintiff's Exhibits, Vol. I</u>, Exh. 9, <u>Meyer Dep. Tr.</u>, pg. 26-27.[9]

On April 8, 2002, Bowen submitted his memorandum recommending that the LLCC Board of Trustees hire Hudson.  <u>Defendant's Memorandum</u>, Exh. E, <u>April 8th Bowen Memo</u>; Exh. D.  In the memo, Bowen stated, "at least three of the selected candidates have excellent strengths and could bring unique talents to the business department and our campus."[10]  Id.  After considering "the needs of the students, the department, the college,

_____

[9]The actual memo written by Meyer to Bowen was not submitted to the Court. Meyer testified at his deposition that he was not pleased with Hudson's presentation during Hudson's interview with the Committee and had concerns over Hudson's frequent job changes.

[10]The three candidates were later identified by Bowen as Hudson, Rudin, and Gregoire.  <u>Plaintiff's Exhibits, Vol. I</u>, Exh. 1, <u>Bowen Dep. Tr.</u>, pg. 67.

the candidate strengths and weaknesses, and statements from the candidate's references," Bowen recommended Hudson for the position for the following reasons:

- His desire to teach
- A positive attitude throughout the interview
- Knowledge of current business trends
- Display of enthusiasm and energy
- Community involvement
- Appropriately dressed for the interview
- Present and past adjunct instructor for the department
- Excellent student rapport
- Excellent student evaluations
- Two master's degrees and working on Ph.D.

Id.

The final steps in the hiring process belonged to Bowen's superiors. First in the chain was Eileen Tepatti (Tepatti), the Associate Vice-President of Instruction, and Bowen's direct supervisor. Plaintiff's Exhibits, Vol. I, Exh. 8, Tepatti Dep. Tr., pgs. 7-8. Tepatti approved Bowen's hiring recommendation the same day by affixing her signature and forwarding his memo to her superior, Dr. Dana Grove, Vice-President of Academic Services. Defendant's Memorandum, Exh. G, April 8th Bowen Memo. Dr. Grove also approved Bowen's recommendation on April 8, 2002, by the same method, and forwarded Bowen's memo to Dr. James Howard

(Howard), President of LLCC.  Id.  It remained for Howard to make a formal recommendation that the body vested with hiring power, the LLCC Board of Trustees, hire Hudson.

On or around April 12, 2002, Rudin spoke with Bowen by phone. Bowen informed her that she was not selected for the position.  Defendant's Memorandum, Exh. F, Rudin's Notes.  Subsequently, Rudin contacted members of the LLCC Board of Trustees.  She met individually with Trustees Kent Gray, Mary Lou Lowder Kent, Mary Ellen Madonia, Carl Oblinger and the student representative, presented them with documentation as to her qualifications, and argued that the most qualified candidate for the Department's faculty opening was not being recommended to the Board.  Id., Exh. F, Rudin Dep. Tr., pgs. 46-50, 52-53.  Each Trustee agreed to investigate Rudin's claims.  Id.

Despite the fact that Bowen had already made his recommendation, Committee member Meyer continued to solicit Committee input to prepare a weighted scoring system, designed to quantify which candidate the Committee preferred.  On April 16, 2002, Meyer forwarded the results from

this effort to the Screening Committee members and Tepatti.[11] <u>Defendant's Memorandum</u>, Exh. G, <u>April 16, 2002, email from Eileen Tepatti to Art Meyer</u>; <u>Defendant's Reply</u>, Exh. D, <u>April 16, 2002, email from Art Meyer to Selection Committee</u>. As calculated by Meyer's weighted scoring system, the candidates were ranked as follows:

1. Theresa Gregoire
2. Janine Rudin
3. Glen Chapuis
4. Cheryl Beery
5. Paul Hudson and James Jump
6. Jose Aleman

<u>Id.</u> Both Bowen and Tepatti felt this scoring system was flawed because it did not consider "strengths or weaknesses, prior community college teaching experience, reference checks, and many other factors that a department chair must take into consideration." <u>Defendant's Memorandum</u>, Exh. G, <u>April 22nd Tepatti Memo</u>, pg. 2.

---

[11]Meyer created the weighted scoring system as follows. First, he asked all Screening Committee members to rank their choices for the faculty position from first to last. Second, he assigned weight to each of the Committee members' choices based on the number of interviews the member attended. For example, the first choice of a Committee member who attended all seven interviews would receive a score of 7, the second choice a score of 6, the third choice a score of 5, and so on. The first choice of a Committee member who only attended six of the seven interviews, however, would receive a score of 6, the second choice a score of 5, and so on. <u>Reply to Plaintiff's Response to Motion for Summary Judgment (d/e 23)</u> (Defendant's Reply), Exh. D, <u>April 16, 2002, email from Art Meyer to the Screening Committee</u>.

On April 22, 2002, Tepatti submitted her first memorandum to President Howard, which described her impressions of the selection process and supported Bowen's recommendation of Hudson. <u>Id.</u> Tepatti noted that Bowen, ". . . considered Paul Hudson [to be a] qualified and a very successful LLCC adjunct with excellent student evaluations. He has two masters' degrees and is a dissertation short of getting his doctorate. Given all of this as well as the college's focus on minority hiring, [Bowen] selected him for the position." <u>Id.</u>, pgs. 2-3. On April 24, 2002, at the LLCC Board of Trustees meeting, President Howard made his formal recommendation that the Trustees hire Hudson for the Department faculty position. Due to Rudin's complaints to the individual Trustees, however, the Trustees postponed their decision to give President Howard additional time to investigate the selection process. <u>Id.</u>, Exh. D, <u>Affidavit of Pam Kaiser</u>, Exh. 1. A special meeting of the Board was scheduled for May 2, 2002.

On April 25, 2002, Junell A. Ransdell, LLCC Assistant Vice President, Human Resources, drafted a letter informing Rudin that another candidate had been recommended for the faculty position, although it is unclear when this letter was sent and when it was received. <u>Plaintiff's Exhibits, Vol. II</u>, Exh. 21.

On April 29, 2002, Tepatti submitted her second memorandum to President Howard, restating her findings regarding the interview process. She added that "[t]he reference checks [for Hudson] were all very strong and positive", and concluded that she "strongly support[s] Rich Bowen's recommendation of Paul Hudson for the . . . faculty position." Defendant's Memorandum, Exh. D, April 29, 2002, Tepatti Memorandum to President Howard (April 29th Tepatti Memo), pg. 2. In his April 30, 2002, Memorandum to the Trustees, President Howard explained that his investigation left him ". . . completely satisfied that established processes have been followed and that the recommendations are both objective and appropriate." Id., April 30, 2002, Memorandum from President Howard to the Trustees (April 30th Howard Memo). Further, President Howard noted:

> . . . the two individuals being recommended for hire [one of which was Hudson] are knowledgeable, experienced individuals with excellent references. They hold for the college an opportunity to enhance our faculty and staff with their expertise. Secondly, in each instance they offer us the opportunity to address the Board's concern with minority representation among faculty and staff at the college.

Id. Tepatti's April 29th Memo was attached to President Howard's April 30th Memo, and Hudson's resume was attached to President Howard's May 2, 2002, Memorandum which contained President Howard's formal

recommendation that the Trustees hire Hudson.  Id., Exh. D.  At the May 2, 2002, special session, the Trustees unanimously approved President Howard's recommendation to hire Hudson.[12]  Id., Minutes of the Special Meeting of the Board of Trustees Lincoln Land Community College Illinois Community College District #526, pg. 2.

In the wake of the Trustees' decision, three participants in the recruitment process stated that Bowen had told them that he felt pressure from the LLCC administration before he made his hiring recommendation. Pat Falconburg (Falconburg), long-time assistant to Bowen, testified:

> Q.  Do you recall how you learned [Hudson had been selected instead of Rudin]?
> A.  I learned it from Mr. Bowen.
> Q.  When you learned that, what was your initial thought?
> A.  I don't think it's fair, it should have been [Rudin].
> . . . .
> Q.  Did you express that to Mr. Bowen?
> A.  Yeah.  He knew that.
> . . . .
> A.  He just said I have to do it this way because I'm getting a lot of administrative pressure, he said that repeatedly to me.
> . . . .
> Q.  Did he elaborate on that at all as far as where the

---

[12]At the time of their decision to hire Hudson, the Trustees included: Craig Findley (Caucasian male), Kent Gray (Caucasian male), Carl Oblinger (Caucasian male), Carol Hansen Posegate (Caucasian female), Mary Ellen Madonia (Caucasian female), Roger Rutherford (Caucasian male), Mary Lou Lowder Kent (Caucasian female) and a student representative.  Defendant's Memorandum, Exh. B, Ralph Aff., pgs. 1-2.

administrative pressure was coming from?

A.  No. No.  He didn't elaborate, he just told me he was getting administrative pressure, and he had to make his choice, and he had done so, and that's what he was going to stand by.

Plaintiff's Exhibits, Vol. I, Exh. 2, Deposition of Pat Falconburg (Falconburg Dep. Tr.), pg. 34-36.  Rudin also claimed that Bowen told her he felt administrative pressure.

A.  [Bowen] said I had too much -- I had administrative pressure, I had to hire this person.

Q.  He said: I had to hire this person?

A.  Right.  Administrative pressure.  Administrative pressure was put on me.

Q.  Did you ask him what that meant?

A.  No.

Q.  Did he explain what that meant?

A.  No.

Q.  Was there anymore to that conversation?

A.  I don't think so.

Id., Exh. 7, Rudin Dep. Tr., pgs. 41.  Finally, Arthur Meyer, a member of the Screening Committee, heard Bowen cite administrative pressure to hire a more diverse faculty as one reason for his hiring recommendation.

A.  . . . Mr. Bowen stated that he was under -- he knew the administration above him wanted a more diverse set of -- more . . . diversity at [LLCC] so he made that statement.

Q.  He made that statement to the [Screening Committee]?

A.  Right, as a justification for the selection of Mr. Hudson. . . . He also said that there's other information that the committee would not have been privy to that he had that was a justification for his decision.

Id., Exh. 9, Meyer Dep. Tr., pg. 39.

In 2002, LLCC employed 118 full-time faculty members, including 109 Caucasians (92.4%), 6 African-Americans (5.1%), 2 Asian/Pacific Islanders (1.7%), and 1 Hispanic (0.8%), of whom 61 were male (51.7%) and 57 were female (48.3%).  Defendant's Memorandum, Exh. B, Ralph Aff., pg. 2.  In the course of the year 2002, the Trustees hired 14 new faculty members, including 12 Caucasians (85.7%), 1 African-American (7.1%), and 1 Asian/Pacific Islander (7.1%), of whom 9 were male (64.3%) and 5 were female (35.7%). Id.  During the period 1998-2002, the years for which records are available, the Trustees hired 53 full-time faculty members, including 49 Caucasians (92.5%), 2 African-Americans (3.8%), and 2 Asian/Pacific Islanders (3.8%), of whom 30 were male (56.6%) and 23 were female (43.4%).  Id.

STANDARD OF REVIEW

At summary judgment, the movant must present evidence that demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The Court must consider the evidence presented in the light most favorable to the non-moving party.

Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Once the moving party has produced evidence showing that it is entitled to summary judgment, the non-moving party must present evidence to show that issues of fact remain. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

### ANALYSIS

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To violate Title VII, an act of discrimination must cause "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998).

LLCC now moves the Court for summary judgment on Rudin's claims under Title VII for racial discrimination (Count I), and gender discrimination (Count II). On Count I, LLCC argues that its motion must

be allowed because Rudin has not set forth a prima facie case of reverse racial discrimination.  On Count II, LLCC acknowledges that Rudin has set forth a prima facie case of gender discrimination, but contends that there is no genuine issue of material fact on the issue of whether LLCC's nondiscriminatory reason for its hiring decision was a pretext for gender discrimination.  For the following reasons, LLCC's Motion is allowed.

I.  RUDIN'S PRIMA FACIE CASE OF REVERSE RACIAL AND GENDER DISCRIMINATION

LLCC does not dispute that Rudin has set forth a prima facie case of gender discrimination; however, it argues that Rudin has failed to present evidence of a prima facie case of reverse racial discrimination.  See Defendant's Memorandum, pg. 25.  Rudin can avoid summary judgment by presenting direct evidence showing discriminatory intent by LLCC or its agents, or she can show discrimination through the indirect method of proof.  Rudin contests LLCC's Motion by arguing that she has presented a prima facie case of reverse racial discrimination by both the direct and indirect methods.  Accordingly, the Court addresses each contention in turn.

A.  Direct Method

Direct evidence of discrimination must ". . . be supported by

allegations which, 'if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption.'" <u>Mills v. Health Care Service Corp.</u>, 171 F.3d 450, 454 (7th Cir. 1999), <u>quoting</u> <u>Eiland v. Trinity Hospital</u>, 150 F.3d 747, 751 (7th Cir. 1998) (citations omitted). Direct evidence must both (1) show the employer's discriminatory intent and (2) relate to the specific employment decision in question. <u>Randle v. LaSalle Telecommunications, Inc.</u>, 876 F.2d 563, 569 (7th Cir. 1989).

Direct evidence need not be as obvious as comments such as, "I won't hire you because [you are in a protected class]," or "I'm firing you because [you are in a protected class.]" <u>Venters v. City of Delphi</u>, 123 F.3d 956, 972-73 (7th Cir. 1997). Instead, "[r]emarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination even if evidence stops short of a virtual admission of illegality." <u>Id.</u> If the comments were made by a decision-maker or one with input into the adverse employment decision, it is possible to infer that the decision-maker was influenced by discriminatory motives in making his decision. <u>Hunt v. City of Markham</u>, 219 F.3d 649, 652-53 (7th Cir. 2000).

Rudin argues that the following constitute direct evidence of racial discrimination: (1) Hudson's insertion into the interview pool by Bowen and Ralph, based on Hudson's race; (2) Meyer's testimony that Bowen stated that he knew the administration wanted a more diversity faculty; (3) Rudin's and Falconburg's testimony that Bowen told them that he was under administrative pressure to make his hiring recommendation; and (4) references to LLCC's interest in hiring minority faculty in the April 22nd and April 30th memoranda of Tepatti and President Howard. <u>Janine Rudin's Memorandum of Law In opposition to Defendant's Motion for Summary Judgment (d/e 20)</u> (Plaintiff's Memorandum), pg. 72. For the following reasons, the Court finds that Rudin has not presented direct evidence of reverse racial discrimination.

First, Ralph and Bowen's insertion of Hudson into the interview pool is not evidence of racial discrimination toward Rudin. Rudin was in no way injured by Hudson's insertion into the interview pool. She simply had to compete against one additional qualified applicant. <u>Duffy v. Wolle</u>, 123 F.3d 1026, 1038-39 (8th Cir. 1997) (holding that, "[t]he only harm to white males is that they must compete against a larger pool of qualified applicants. This, of course, 'is not an appropriate objection', and does not state a

cognizable harm.").

Second, Meyer accused Bowen of recommending Hudson because of Hudson's race, but that accusation was based on Meyer's own interpretation of Bowen's statements. Bowen's statements, as reported by Meyer, however, are not sufficiently direct to constitute direct evidence of racial discrimination. Meyer testified that Bowen told the Screening Committee that: ". . . [Bowen] knew the administration above him wanted a more diverse set of -- more diverse -- diversity at Lincoln Land so he made that statement." Plaintiff's Exhibits, Vol. I, Exh. 9, Meyer Dep. Tr., pg. 39. Meyer interpreted this statement to mean that Bowen used Hudson's race as "a justification for the selection of Mr. Hudson." Id. Yet this inference is one of many that could be drawn from Bowen's statement. Further, it is not illegal for the LLCC administration to desire a more diverse faculty. Finally, the Seventh Circuit has stated that speculation about the thoughts of a decision-maker by a non-decision-maker are irrelevant to a direct evidence analysis. "Statements by a non-decision-maker that amount to mere speculation as to the thoughts of the decision-maker are irrelevant to our inquiry." Chiaramonte v. Fashion Bed Group, Inc., 129 F.3d 391, 397 (7th Cir. 1997). Meyer was not a decision-maker, despite his membership

on the Screening Committee.  Accordingly, Meyer's inference drawn from Bowen's statement is not the "smoking gun" necessary to provide direct evidence of discrimination.  <u>Id.</u>

Third, Rudin's deposition testimony that Bowen was under administrative pressure to hire Hudson is not specific enough to be direct evidence of discrimination.  When prompted, Rudin simply claimed that Bowen told her he was under administrative pressure to make a decision.  <u>Plaintiff's Exhibits, Vol. I</u>, Exh. 7, <u>Rudin Dep. Tr.</u>, pgs. 41-42.  Further, Rudin's notes, composed contemporaneously to her conversation with Bowen, do not indicate that Bowen was under administrative pressure to hire Hudson because of his race.  <u>Defendant's Memorandum</u>, Exh. F, <u>Rudin Notes</u>, ¶ 7.  By the same token, Falconburg's testimony simply stated that Bowen told her he was under administrative pressure to make a decision.  <u>Plaintiff's Exhibits, Vol. I</u>, Exh. 2, <u>Falconburg Dep. Tr.</u>, pg. 35.  Accordingly, neither Rudin's nor Falconburg's deposition testimony constitutes direct evidence of racial discrimination.  Administrative pressure to make a decision could relate to the time the process was taking or any number of other things.

Finally, both Tepatti's April 22nd Memo and President Howard's April

30th Memo do not constitute direct evidence of discrimination. In each case, the author stated Hudson's qualifications, followed by the brief observation that Hudson would improve the faculty's diversity. Tepatti's April 22nd Memo states that Bowen considered ". . . Paul Hudson qualified and a very successful LLCC adjunct with excellent teaching evaluations. He has two masters' degrees and is a dissertation short of getting his doctorate. Given all of this as well as the college's focus on minority hiring, Rich selected him for the position." Defendant's Memorandum, Exh. G, April 22nd Tepatti Memo, pg. 2-3. President Howard's April 30th Memo notes that both candidates he recommended to the Board of Trustees, one of whom was Hudson, "are knowledgeable, experienced individuals with excellent references. They hold for the college an opportunity to enhance our faculty and staff with their expertise. Secondly, in each instance they offer us the opportunity to address the Board's concern with minority representation among faculty and staff at the college." Defendant's Memorandum, Exh. D, April 30th President Howard Memo. Both memoranda justified Hudson's recommendation on non-discriminatory grounds before noting as an aside that he also would increase the faculty's diversity. These statements are not sufficiently direct to constitute direct

evidence of racial discrimination.  Therefore, Rudin has not presented direct evidence of racial discrimination.

B.    Indirect Method

Rudin can also show racial discrimination through the indirect method of proof.  In order to make out a prima facie indirect case, Rudin must present evidence that: (1) background circumstances exist that indicate that LLCC is one of those unusual employers that discriminates against the majority; (2) she was qualified for an open position; (3) she was not hired; and (4) another employee of a different race was hired for the position, or the position remained open.  Mills, 171 F.3d at 454-57.[13]

If Rudin presents evidence sufficient to establish a prima facie case, LLCC must present a non-discriminatory reason for the adverse employment decision.  Once LLCC makes this showing, Rudin then must present evidence showing that LLCC's stated reason is a pretext, meaning that LLCC did not honestly believe that the stated reason was the basis for

---

[13]Rudin argues that inclusion of a "background circumstances" prong in the indirect method of proving discrimination misconstrues the nature of Title VII. Plaintiff's Memorandum, pg. 35.  This Court is bound to follow the precedent set forth by the Seventh Circuit, however, which on this question is clear.  Mills, 171 F.3d at 454-57.  In addition, the "background circumstances" prong is used in reverse race discrimination cases in lieu of the requirement that Plaintiff show she is a member of a protected class; clearly Rudin could not make a showing that she is a member of a racially protected class.  Id.

its decision.  <u>Bell v. E.P.A.</u>, 232 F.3d 546, 549-50 (7th Cir. 2000).

In its Motion for Summary Judgment, LLCC argues that Rudin is unable to establish the first prong of her <u>prima facie</u> case – the existence of background circumstances that indicate LLCC is one of the unusual employers that discriminates against the majority.  <u>Defendant's Memorandum</u>, pgs. 15-25.  For the following reasons, the Court finds that Rudin has not stated a <u>prima facie</u> case of reverse racial discrimination.

The background circumstances test that a Caucasian plaintiff must pass provides employers with the same "'screening out benefits' that the prima facie test was intended to provide" for minority plaintiffs.  <u>Mills</u>, 171 F.3d at 457, <u>quoting</u> <u>Jayasinghe v. Bethlehem Steel Corp.</u>, 760 F.2d 132, 134 (7th Cir. 1985).  There are two categories of evidence that courts have identified as demonstrating the existence of background circumstances: "[1] 'evidence indicating that the particular employer at issue has some reason or inclination to discriminate invidiously against whites . . . ,' and [2] 'evidence indicating that there is something 'fishy' about the facts of the case at hand.'"  <u>Id.</u> at 455, <u>quoting</u> <u>Harding v. Gray</u>, 9 F.3d 150, 152-53 (D.C. Cir. 1993).

If Rudin is unable to ". . . make a prima facie case under the modified

test, [she] can demonstrate illegal discrimination by any other 'indirect evidence sufficient to support a reasonable probability . . . that but for [her] status [as a white female] the challenged employment decision' would not have occurred." Id. at 456, quoting Taken v. Oklahoma Corp. Comm'n, 125 F.3d 1366, 1369 (10th Cir. 1997). Further, the Seventh Circuit has cautioned that:

> . . . this modified test is not to be interpreted in a constricting fashion. . . . Moreover, if a plaintiff cannot show background circumstances, but "has established a logical reason to believe that the [employer's] decision rests on a legally forbidden ground," such as his race or gender, [she] may shift the burden to the defendant to prove that the challenged employment action was actually based on legitimate, non-discriminatory reasons.

Id. at 457, quoting Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir. 1996) (per curiam).

Plaintiffs have successfully demonstrated the existence of background circumstances, for example, when a woman was hired instead of a man and the woman "was clearly less qualified than the [male] plaintiff, the hiring authority expressed intense interest in hiring a woman, and there was a pattern of hiring women in the past." See Id. at 455. A Plaintiff also demonstrates the existence of background circumstances where nearly all of

the decision-makers were of a different race (or sex) than the plaintiff, and plaintiff was transferred due to an attempt to racially "reculture" the school, <u>Mohr v. Chicago School Reform Bd. of Trs.</u>, 99 F.Supp.2d 934, 938 (N.D. Ill. 2000); where African-American decision-makers replace Caucasian plaintiff with an African-American manager with less management experience, <u>Perry v. Comm. Action Servs.</u>, 82 F.Supp.2d 892, 895 (N.D. Ill. 2000); and where a decision-maker took an EEO officer's diversity recommendation into account when recommending a minority candidate for promotion despite a Caucasian candidate's superior qualifications, <u>Tevlin v. Metro. Water Reclamation Dist.</u>, 237 F.Supp.2d 895, 901 (N.D. Ill. 2002).

Rudin contends that she has satisfied the background circumstances test by presenting evidence of the following: (1) Rudin was the superior candidate; (2) Hudson's insertion into the interview pool by Bowen and Ralph was racially-motivated; and (3) Bowen recommended that LLCC hire Hudson based on his race. <u>Plaintiff's Memorandum</u>, pg. 38. In the alternative, Rudin also argues that the aggregated evidence supporting the aforementioned circumstances provides a logical reason why LLCC's decision to hire Hudson rested on a legally forbidden ground. <u>Mills</u>, 171

F.3d at 457.

Viewing the evidence in the light most favorable to Rudin, the Court finds that none of the aforementioned circumstances support an inference sufficient to support the background circumstances test. First, although Rudin contends that she and Hudson share essentially the same educational background, that ". . . her professional background is every bit equal to Mr. Hudson's," and that she taught more classes at LLCC than Hudson, with better student evaluations, Rudin cannot show that she was more qualified for the faculty position than Hudson. <u>Plaintiff's Memorandum</u>, pgs. 40-44.

The evidence before the Court shows that Hudson is more educated than Rudin. Hudson has two Master's degrees; Rudin has one. Hudson's transcripts from Western Michigan University show credit for graduate coursework completed in the years 1992 through 1994, after he received his 1992 Master of Arts in Management degree. <u>Plaintiff's Exhibits, Vol. II</u>, Exh. 28. Further, Hudson was enrolled in a doctoral dissertation course for the academic periods Fall 1995, Winter 1996, Spring 1996, Summer 1996, Fall 1996, Winter 1997, and Spring 1997. <u>Id.</u> Rudin is correct when she states that Hudson's transcripts do not indicate that he was working on his Ph.D. in 2002, during the interview and selection process for the

Department faculty position.  <u>Plaintiff's Memorandum</u>, pg. 40.  There is no doubt, however, that Hudson did graduate course work toward his Ph.D., and was enrolled continuously for two years in a doctoral dissertation course.  Hudson had more formal education than Rudin during the relevant time period.

While Rudin's work and teaching history are impressive, they do not demonstrate that she was a more qualified candidate for the faculty position than Hudson.  Hudson's resume listed 27 years of experience in various marketing, sales, consulting, and management positions.  Rudin's resume included 13 years of experience in various human resources, administrative, consulting, and management positions.  Even if the Court assumes that Bowen had knowledge of Rudin's work experience that was not included on her resume, that work experience at most made her equally qualified, but not more qualified, than Hudson.

Rudin did have more years of community college teaching experience than Hudson, with 9 years of continuous teaching experience at LLCC.  Hudson taught only 5 courses between 1994 and 2002, two of which were at LLCC (1999, 2001).  Yet any difference in teaching experience was offset by Hudson's greater educational qualifications, which included an additional

Master of Arts in Management degree, and doctoral coursework and dissertation studies between 1991-1997.  Both Rudin and Hudson had excellent student evaluations.  In sum, Rudin cannot prove that she was the more qualified candidate.

Second, Rudin argues that Ralph and Bowen's act of adding Hudson to the interview pool constituted a background circumstance, and cites the Court to MD/DC/DE Broadcasters Ass'n v. F.C.C. in support of this contention.  MD/DC/DE Broadcasters, 236 F.3d 13 (D.C. Cir. 2001).  The rule at issue in MD/DC/DE Broadcasters, however, is distinct from the action taken in the present case.  In MD/DC/DE Broadcasters, an F.C.C. recruitment rule set up a tracking system that recorded the number of women and minority job applicants reported by licensees.  The D.C. Circuit's concern with the F.C.C.'s rule was that licensees would so focus their limited recruitment efforts to recruit women and minorities that otherwise qualified non-minority candidates would never learn of open positions.  Id. at 20-21.  Applying strict scrutiny to the F.C.C.'s rule, the court found that the rule was not ". . . narrowly tailored to further the Commission's stated goal of non-discrimination in the broadcast industry." Id. at 22.

Rudin brings her suit under Title VII, however, not the equal protection clause of the Fourteenth Amendment. LLCC's policy does not restrict the recruitment of non-minority candidates in any way. It also does not affect the ultimate hiring decision. Accordingly, the holding of MD/DC/DE Broadcasters does not apply to the situation before the Court. Rudin herself was not injured by Hudson's insertion into the interview pool. She simply had to compete against one additional qualified applicant. Duffy, 123 F.3d at 1038-39. Accordingly, Ralph and Bowen's action of inserting Hudson into the interview pool does not raise an inference that LLCC is one of the unusual employers who discriminates against the majority, and it does not constitute a background circumstance.

Third, Rudin argues that testimony by Meyer, Falconburg, and Rudin, together with the memoranda by Tepatti and President Howard, and the fact that both Bowen and Hudson are African-American support an inference that background circumstances exist. For the following reasons, the Court finds that Rudin's evidence does not support such a finding.

While Falconburg and Rudin both testified that Bowen complained about being under administrative pressure to make a decision, neither could define what kind of pressure Bowen was under. Plaintiff's Exhibits, Vol. I,

Exh. 7, <u>Rudin Dep. Tr.</u>, pgs. 41-42; Exh. 2, <u>Falconburg Dep. Tr.</u>, pg. 35. In fact, Bowen's statements to both Rudin and Falconburg are consistent with his testimony that he was under pressure to make a hiring recommendation in time for the April 24, 2002, Trustees Board Meeting, and had run out of time to reconvene the Selection Committee. <u>Defendant's Memorandum</u>, Exh. E, <u>Bowen Dep. Tr.</u>, pgs. 51-53, 61. Meyer's testimony as follows, while suggestive, is inconclusive.

> A. . . . Mr. Bowen stated that he was under -- he knew the administration above him wanted a more diverse set of -- more diverse -- diversity at Lincoln Land so he made that statement.
> Q. He made that statement to the committee?
> A. Right, as a justification for the selection of Mr. Hudson.

<u>Plaintiff's Exhibits, Vol. I</u>, Exh. 9, <u>Meyer Dep. Tr.</u>, pg. 38-39. It is Meyer's speculation that Bowen would only have mentioned diversity if it played a factor in his decision, and that the administration placed pressure on Bowen to choose Hudson. That speculation is unsupported by the testimony of Bowen and Tepatti, who were also present at the meeting. <u>Plaintiff's Exhibits, Vol. I</u>, Exh. 1, <u>Bowen Dep. Tr.</u>, pgs. 90, 93; Exh. 8, <u>Tepatti Dep. Tr.</u>, pg. 69, 87, 118-120. As for Tepatti and President Howard's memoranda, as discussed <u>supra</u>, both memos describe Hudson's

qualifications for the faculty position before mentioning as an aside that Hudson would improve LLCC's diversity. In context, they do not support the inference that Hudson was hired because of his race.

Finally, the fact that Bowen and Hudson are both African-American, while potentially significant, does not aid Rudin's effort here. In 2002, LLCC hired 14 new faculty members, including 12 Caucasians, 1 African-American (Hudson), and 1 Asian/Pacific-Islander. <u>Defendant's Memorandum</u>, Exh. B, <u>Ralph Aff.</u>, ¶ 3. Overall, LLCC employed 118 full-time faculty members, including 109 Caucasians (92.4%), 6 African-Americans (5.1%), 2 Asian/Pacific-Islanders (1.7%), and 1 Hispanic (0.8%). <u>Id.</u> Further, since 1998 Bowen had recommended the Trustees hire 58 adjunct faculty, including 49 Caucasians, 4 African-Americans, and 1 American Indian.[14] <u>Id.</u> This hiring history does not suggest that Bowen, or LLCC, was in any way one of the unusual employers that discriminate against the majority.

Further, this evidence does not provide "'a logical reason to believe that the [employer's] decision rests on a legally forbidden ground.'" <u>Mills</u>, 171 F.3d at 457, <u>quoting</u> <u>Carson</u>, 82 F.3d at 159. Rudin's inability to

---

[14]Four adjunct faculty hires did not declare their ethnicity. <u>Id.</u>

demonstrate that she is a more qualified candidate, or that LLCC's hiring record suggests an "intense interest" in hiring minority candidates, is fatal to her attempt to show background circumstances.  See id. at 455; Mohr, 99 F.Supp.2d at 938; Perry, 82 F.Supp.2d at 895; Tevlin, 237 F.Supp.2d at 901.  Therefore, the Court finds that Rudin has failed to meet her obligation to present a prima facie case of reverse racial discrimination.

II.  LLCC'S NON-DISCRIMINATORY REASON FOR THE ADVERSE EMPLOYMENT DECISION

LLCC does not dispute that Rudin has set forth a prima facie case of gender discrimination.[15]  Defendant's Memorandum, pg. 25.  Accordingly, the burden of production now shifts to LLCC to "clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action."  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993) (emphasis and

---

[15]The Court notes that the tests at this stage of the analysis are identical for both gender and reverse racial discrimination.  LLCC's non-discriminatory reasons for hiring Hudson instead of Rudin are identical as well.  Defendant's Memorandum, pg. 25. Accordingly, in an abundance of caution, the Court concludes that for the reasons set forth infra, had Rudin been able to establish a prima facie case of reverse racial discrimination, she would still not have been able to survive LLCC's motion for summary judgment because she cannot show that LLCC's non-discriminatory reason was pretextual.

quotations omitted). It is important to note, however, that although the burden of production shifts to LLCC to produce evidence of a non-discriminatory reason for its decision to hire Hudson, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

If LLCC meets this burden of production, "the inference of discrimination disappears and the plaintiff must then demonstrate by a preponderance of the evidence that the reasons proffered by the defendant were pretextual for intentional discrimination." Hasham v. California State Bd. of Equalization, 200 F.3d 1035, 1044 (7th Cir. 2000). In this context, pretext is defined as outright lies, reasons that are factually baseless, or explanations that change between the time of the adverse employment decision and the onset of litigation. O'Neal v. City of New Albany, 293 F.3d 998, 1005-06 (7th Cir. 2002). At the pretext stage of analysis, the Court does not function as a super-personnel department sitting in judgment of the wisdom of LLCC's reasons for the questioned decision. Id. at 1046. The Court's inquiry is focused on whether LLCC honestly believed the reason given for hiring Hudson. Id. at 1045.

LLCC states that Hudson was hired because he was the most qualified candidate, and submits evidence created by the various members of LLCC's staff in support of that reason. Defendant's Memorandum, pg. 28. Beginning with Bowen, the recommendation to hire Hudson proceeded upward through the chain of command first to Tepatti, then to Grove, next to President Howard, and finally to the Trustees, who unanimously voted to approve President Howard's hiring recommendation. Defendant's Memorandum, Exh. D, May 2, 2002, Minutes of the Special Board Meeting of the Board of Trustees Lincoln Land Community College Illinois Community College District #526 (May 2nd Trustees Minutes), Motion No. 05-02-02-3.

Bowen recommended Hudson from among three excellent candidates he felt could all perform the job, based on the following:

- [Hudson's] desire to teach
- A positive attitude throughout the interview
- Knowledge of current business trends
- Display of enthusiasm and energy
- Community involvement
- Appropriately dressed for the interview
- Present and past adjunct instructor for the department
- Excellent student rapport
- Excellent student evaluations
- Two master's degrees and working on Ph.D.

Defendant's Memorandum, Exh. E, April 8th Bowen Memo. Tepatti supported Bowen's recommendation because Bowen "considered Paul Hudson qualified and a very successful LLCC adjunct with excellent student evaluations." Id., Exh. G, April 22nd Tepatti Memo. Further, she noted, "[Hudson has] two masters' degrees and is a dissertation short of getting his doctorate. The reference checks were all very strong and positive." Id., April 29th Tepatti Memo. Grove simply approved Bowen's recommendation by signature, with no explanation. President Howard acknowledged the recommendations of those below him, calling them "objective and appropriate", affirmed his satisfaction with the selection process, and added his own impression that Hudson was a "knowledgeable, experienced [individual] with excellent references." Id., Exh. D, April 30th Howard Memo.

At the April 24, 2002, Trustees' meeting, hiring decisions were postponed for only two recommendations, one of which was Hudson's. This doubtless reflected the fact that Rudin had spoken personally with four of the seven Trustees, and presented them with her qualifications and concerns about the hiring process. At the May 2, 2002, special Trustees' meeting, however, the Trustees unanimously approved President Howard's

recommendation to hire Hudson, thereby adopting the reasoning of the decision-making chain.[16]

LLCC's proffered reason is a legitimate, non-discriminatory reason for hiring Hudson. Further, it is supported by admissible evidence. Accordingly, the Court finds that LLCC has presented sufficient evidence to remove the inference of gender discrimination and shift the burden of production back to Rudin to show that LLCC's reasons given for hiring Hudson were a pretext for gender discrimination.

III. PRETEXT

---

[16]Rudin contests LLCC's claim that the Trustees "believed [Hudson] was the best candidate for the position." Defendant's Memorandum, pg. 28. Rudin notes that LLCC has submitted neither depositions nor affidavits by the individual Trustees, and concludes that LLCC "has offered absolutely no evidence to support the proposition that the [Trustees] in fact concluded that Hudson was the best candidate." Plaintiff's Memorandum, pg. 53. Further, Rudin argues that Bowen was the true decision-maker. Id. at 58. Neither contention is entirely accurate. As described, supra, LLCC employees throughout the decision-making chain gave reasons supporting the ultimate outcome, or affected the process in a significant way. Bowen made the most comprehensive evaluation of Hudson's qualifications. Tepatti and Howard added their own evaluations. By approving the joint recommendation to hire Hudson, the Trustees adopted the reasoning of those below them on the decision-making chain.

Furthermore, the cases Rudin cites in support of her argument are distinguishable from the present record. In Williams v. Chicago Bd. of Educ., the School Board provided absolutely no evidence as to how anyone in the decision-making chain determined that six of the School Business Mangers it hired were more qualified than the plaintiff. Williams, 2000 WL 1425289, *6 (N.D. Ill., Sept. 26, 2000). Similarly, in Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc., the hiring decision was delegated entirely to a production foreman, but the defendant provided no reasons why plaintiff was not hired. Rowe, 690 F.2d 88, 96 (6th Cir. 1982). Here, however, LLCC has presented evidence showing why Bowen felt Hudson was the most qualified candidate.

Rudin makes no attempt to establish that LLCC's non-discriminatory reason for hiring Hudson is a pretext for gender discrimination. <u>See Plaintiff's Memorandum</u>, pgs. 61-72. In fact, Rudin abandons her gender discrimination claim in favor of focusing solely on her reverse racial discrimination claim. <u>Id.</u> Accordingly, LLCC's Motion for Summary Judgment as to Rudin's gender discrimination claim (Count II) is allowed.

The Court does not reach the pretext argument with respect to the reverse race discrimination claim since Rudin did not put forth a <u>prima facie</u> case of race discrimination. The Court notes, parenthetically, that even if Rudin had set forth a <u>prima facie</u> case of reverse race discrimination, she has not demonstrated that LLCC's stated nondiscriminatory reason for hiring Hudson was a pretext. Rudin seeks to establish pretext by showing that no decision-maker ever concluded that Hudson was the most qualified candidate; that LLCC's justification for hiring Hudson has changed over time; and that Rudin was the most qualified candidate. To accommodate for the multiple links in the decision-making chain, Rudin can establish pretext if she shows that a decision-maker in the chain lied, cited reasons that are factually baseless, or gave explanations that changed between the time of the adverse employment decision and the onset of litigation, and

that the decision-maker's pretextual rationale was adopted through the decision-making chain into the final hiring decision.

Rudin has not shown that LLCC's given reason is a pretext on any of the grounds stated in her brief. First, Rudin's argument that no decision-maker ever concluded that Hudson was the most qualified candidate at the time of the hiring decision is disingenuous. In his April 8th Memo, Bowen stated that three candidates (later identified as Hudson, Rudin, and Gregoire) were all excellent candidates with strong qualifications. Bowen chose Hudson and listed his reasons for doing so in his Memo. None of the reasons he gave were racially-based. Rudin has not shown that Bowen's stated reasons were lies, factually without merit, or are no longer reasons Bowen uses to justify his decision.[17]

Second, LLCC's reasons for hiring Hudson have not changed over time. Rudin cites Falconburg's, Meyer's, and her own testimony, as well as Tepatti's and Howard's memoranda, to argue that Bowen was under

---

[17]The Court notes that Bowen's April 8th Memo states that Hudson has "[t]wo master's degrees and working on PhD." Defendant's Memorandum, Exh. E, April 8th Bowen Memo. Hudson's transcripts show that he was not currently enrolled as a doctoral student, but had last been enrolled in Spring 1997. Plaintiff's Exhibits, Vol. II, Exh. 28. Tepatti's April 29th Memo, which was presented to the Trustees at the May 2, 2002, special session, corrected this overstatement. She noted, "Furthermore, Mr. Hudson possesses two masters' degrees and is a dissertation short of getting his doctorate." Id., Exh. D, April 29th Tepatti Memo, pg. 2.

administrative pressure to recommend Hudson due to his race. As explained, _supra_, each of Falconburg's, Meyer's, and Rudin's deposition testimony is inconclusive as to what type of pressure Bowen felt. Tepatti and Howard's memoranda mention Hudson's race as an aside after citing Hudson's qualifications, not as a reason for making a hiring recommendation. This case is a significant departure from <u>Bass v. Bd. of County Comm'rs, Orange County, Florida</u>, cited by Rudin as a comparable case, where the County's affirmative action goals for minority hiring were reinforced by periodic progress reports to County managers, used as benchmarks for managerial performance, and designed into the interview system to further the County's affirmative action goals. <u>Bass</u>, 256 F.3d 1095, 1107 (11th Cir. 2001).

Finally, Rudin has not shown that she was the more qualified candidate, as described _supra_. Therefore, LLCC's Motion for Summary Judgement is allowed.

## CONCLUSION

THEREFORE, for the reasons set forth above, Lincoln Land Community College's Motion For Summary Judgment (d/e 17) is ALLOWED. This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:    October 1, 2004.

FOR THE COURT:

s/ Jeanne E. Scott
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE